Robert W. **HAMLIN** and Jeanne E. Hamlin, his wife, Plaintiffs,

v.

**CHARTER TOWNSHIP OF FLINT,** Charter Township of Flint Fire Department, **Greg Wright,** and **Sally Shaheen Joseph,** Jointly and Severally, Defendants.

No. 95–75425–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 4, 1996.

---

Dennis L. Gabrian, Bloomfield Hills, MI, for plaintiffs.

Norbert B. Leonard, Bloomfield Hills, MI, for defendants.

## *OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiffs Robert W. Hamlin and his wife, Jeanne E. Hamlin, commenced this action in this Court on October 27, 1995 against Defendants Charter Township of Flint (the "Township"), Charter Township of Flint Fire Department (the "Fire Department"), Township Supervisor Sally Shaheen Joseph, and Fire Department Chief Greg Wright arising out of the September 19, 1994 termination [1] of Plaintiff Robert Hamlin ("Hamlin") from the Fire Department. Plaintiffs' Complaint alleges that this termination violated: (1) the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*, (the "ADA"), (2) the Michigan Handicapper's Civil Rights Act, M.C.L. § 37.1101, *et seq.*, (the "MHCRA"), and (3) as to the Township and the Fire Department, the public policy of the State of Michigan to permit freedom of speech and association.[2]

Presently before this Court is Defendants' Motion for summary judgment, brought pursuant to Fed.R.Civ.P. 56(c). In this motion, Defendants argue that: (1) Hamlin is unable to perform the essential functions of his former job as Assistant Fire Chief of the Fire Department; (2) Hamlin did not suffer an adverse employment action because of his disability; (3) Defendants Joseph and Wright, as individual defendants, cannot as a matter of law be held liable for violations of the ADA; (4) Plaintiffs have failed to plead or present facts which could support or constitute a claim for violation of public policy; and (5) Hamlin's application for and receiving of permanent and total disability payments constituted a knowing waiver of any allegedly implicated statutory rights under the ADA and the MHCRA and an admission that he is not a qualified individual within the meaning of the ADA or the MHCRA.

Having reviewed the pleadings, Defendants' Motion and supporting briefs, and Plaintiffs' Response, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

---

1. Although the Township disputes describing Plaintiff Richard Hamlin's separation from service as a "termination", Defendants' motion states that Defendants will for the purposes of this motion accept this description.

2. On May 10, 1996, this Court dismissed: (1) the public policy claim (Count III of Plaintiffs' Complaint) as to Defendants Joseph and Wright (2) as to all Defendants, Counts IV and V of Plaintiffs' Complaint which alleged intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. Additionally, Count VI of Plaintiffs' Complaint includes a claim for loss of consortium, which is a derivative claim that would "drop out" if the other claims are dismissed, and remain if they are not.

## II. *FACTUAL BACKGROUND*

Hamlin is a 45 year-old caucasian male who was employed by the Fire Department from January 1976 until September 1994. From 1976 through 1992, Hamlin received several promotions, culminating in his promotion to Assistant Fire Chief in April 1992. The job description for this position was specifically negotiated and agreed upon between Firefighters Local 1425, Hamlin's labor union, and the Township. Under the rubric of "General Description of Duties", the job description states that the Assistant Fire Chief has responsibility for "[r]espond[ing] to alarms and special calls and assum[ing] command of operations if required." (Plaintiffs' Ex. 2).

In September 1992, Hamlin suffered a heart attack. He was off work completely and receiving worker's compensation benefits until April 1993 when he returned to work, resuming his position as Assistant Fire Chief. When Hamlin returned to work, his doctor did not place any restrictions on him in the document which authorized his return to work. (Plaintiffs' Ex. 4). Moreover, Hamlin himself never informed the Fire Department that upon his return he was still under the care and treatment of a doctor and on certain medications due to his cardiac condition. (R.Hamlin Deposition, p. 123).

Defendant Wright, however, has stated that when Hamlin returned to work, he knew or should have known that the policy of the Township did not provide for permanent limited duty firefighters. (Plaintiffs' Ex. 4). What was in effect, however, was Standard Operating Procedure 93–1[3] ("SOP 93–1") which provides that when any member of the full-time or on-call staff " . . . is on medical restriction where he or she cannot do lifting without restrictions, running, climbing, etc., [he or she] shall not participate in . . . [a]larms . . . , [d]riving or operating . . . equipment, [or] work[ing] . . . 'shift'[4] or part thereof. . . ." (Plaintiffs' Ex. 4, Plaintiffs'

Complaint Ex. 3). After SOP 93–1 became effective, two firefighters, Frank Kirby and Eddie Chaprinka, were placed on limited duty—including not responding to alarms—because of medical restrictions. (Plaintiffs' Ex. 7, Rowley affidavit, p. 2). What SOP 93–1 apparently contemplates—and what apparently occurred with respect to Kirby and Chaprinka—are situations that are not permanent. Chaprinka, for example, had an ankle injury which put him on light duty for Summer 1993, and he is currently on light duty with a back injury. (G.Wright Deposition, p. 99). Furthermore, there is no evidence as to whether the Fire Department or Hamlin ever considered SOP 93–1 as an option for him upon his return.

On November 29, 1993, Hamlin was offered the position of Fire Chief. He refused this promotion, however, because he believed that the promotion would result in a decrease in his compensation and benefits due to the lack of overtime pay. Plaintiffs allege that this refusal caused the Township Supervisor, Defendant Sally Joseph, to suffer professional embarrassment, which in turn eventually caused her to seek Hamlin's termination. (Def. Ex. A, R. Hamlin Deposition, Vol I, p. 75).

Plaintiffs further contend that after Hamlin refused the promotion, the Township Treasurer assured him that the Township Board would vote on and pass an enhanced compensation package and that he would then again be offered the promotion.[5] Although the additional compensation issue did come before the Board, it did not pass. What happened next is not clear because the parties dispute whether Hamlin was offered the job again and rejected it or whether he was never again officially offered the job. Nevertheless, at approximately this time, Hamlin spoke to the local media and expressed his frustration over not being able to come to terms with the Township for the

---

**3.** Donald Rowley, who was then Fire Chief, issued this standard operating procedure on January 4, 1993.

**4.** *See* discussion of "shift" at p. 6, *infra*.

**5.** Defendants' motion correctly notes that no government official can commit a municipality to any position without consent of the decision-making body—here, the Township Board. *See, Nickola v. Grand Blanc Township,* 47 Mich.App. 684, 209 N.W.2d 803 (1973).

Fire Chief job.[6] Eventually, the position of Fire Chief was offered to, and accepted by, Defendant Greg Wright on essentially the same terms that were originally offered to Hamlin.[7]

On September 8, 1994, Defendant Wright, as the Fire Chief, ordered Hamlin to report to Fire Station #2 to cover for Captain Bielby while he went to a dentist appointment. (Plaintiffs' Ex. 4). Because Captain Bielby was working "shift" at this time, covering for him would have involved assuming the responsibilities of working shift while Bielby was at the dentist. Working shift means the 24-hour shift worked by a firefighter as a primary responder at a fire station.[8]

Whether working shift is part of the Assistant Fire Chief's duties is a matter much in dispute. From the time Hamlin was promoted to Fire Marshal/Inspector in May 1989 through his tenure as Assistant Fire Chief until September 1994, Plaintiffs assert that Hamlin was never required to work a 24-hour shift. Furthermore, Former Fire Chief Donald Rowley, Defendant Wright's immediate predecessor, has stated that, while prior to 1985 the Assistant Fire Chief did work 24-hour shifts as part of his or her required

duties, in 1985 the Assistant Fire Chief position was changed to a 40-hour per week position which did not require working shift. (Plaintiffs' Ex. 7, Rowley affidavit, p. 2).[9] Additionally, Hamlin's predecessor, Former Assistant Fire Chief Gregg Nordman, has stated that after 1985 he was not required to work shift, and as a result, when he occasionally volunteered to work shift, other full-time firefighters, including Defendant Wright, objected—presumably because they wanted the overtime for themselves. (Plaintiffs' Ex. 17, Nordman affidavit, p. 2). Nevertheless, Nordman has also stated that after 1985 he did continue to respond to alarms and assume command at fire scenes, including occasionally performing firefighting duties. (*Id.*). However, Plaintiffs point out that Defendant Wright has stated that he does not know how many times Hamlin's successor, Assistant Fire Chief Ron Csiky, has worked shift since Hamlin was terminated. (G. Wright Deposition, pp. 24–25). Finally, based on Nordman, Hamlin, and Csiky's experiences, Plaintiffs argue that regardless of the above discussion, this function is not significant because although it could potentially arise regularly, it typically is an infrequent responsibility.

6. Plaintiffs' claim that the Defendant Township and the Defendant Fire Department violated public policy stem from their allegation that Hamlin's termination was motivated in part by his engaging in constitutionally protected activity—negotiating a salary for his promotion to Fire Chief, his statements to the press, and his challenging Wright's selection as Fire Chief.

7. Plaintiffs allege in their Response that Defendant Joseph refused to negotiate in good faith for a salary package that would not have resulted in a pay cut for Hamlin. Hamlin also asserts that he had a long rivalry with Defendant Wright within the Department, including challenging the eligibility of Defendant Wright to test for promotion to Fire Chief. Therefore, it is these factors, according to Plaintiffs, that allegedly motivated Defendants to embark upon a plan to diminish the authority and credibility of Hamlin after Defendant Wright became Fire Chief, including resurrecting a six year-old sexual harassment claim against Hamlin and using his cardiac condition as a means for forcing him out of the Fire Department and justifying his termination.

8. The Fire Department maintains and operates 3 fire stations. At each fire station, a firefighter is

assigned to work a 24-hour shift to be the primary responder on alarms and to take the equipment to the scene. Upwards of 12 on-call firefighters are simultaneously summoned and dispatched to the scene for reinforcing and assisting the primary responder. Until the on-call firefighters arrive at the scene, the primary responder is responsible for dealing with the circumstances of the alarm. (Plaintiffs' Ex. 5, G. Wright deposition, pp. 12–18).

9. However, this may not be relevant because it is not disputed that at the time Hamlin became Assistant Fire Chief he was required to "assume command of operations" in response to "an alarm or special call", which Defendant Wright has stated includes covering for someone else who is working shift. Defendant Wright's statement is confirmed by the fact that prior to Defendant Wright's tenure as Fire Chief, then Fire Chief Rowley also asked Plaintiff to fill-in for a firefighter and work shift. (Plaintiffs' Response, p. 3 (citing Plaintiffs' Ex. 7, Rowley affidavit, p. 7)). Thus, during Hamlin's tenure as Assistant Fire Chief, the Assistant Fire Chief was not required to work a 24-hour shift, but he may have been required, when necessary, to fill-in or cover for firefighters who were working such a shift. *See* immediate discussion, *infra*.

(G. Wright Deposition, pp. 24–25, 92–93, 101–02, 114, 116–18).

Nevertheless, on one occasion after he returned from his heart attack, then Fire Chief Donald Rowley asked Hamlin to fill-in for a firefighter and work a 24-hour shift. (Plaintiffs' Ex. 7, Rowley affidavit, p. 7). Hamlin, however, refused explaining that his doctor had advised him not to work shift. (*Id.*). On account thereof, Rowley did not require Hamlin to work shift. (*Id.*).

Thus, on September 8, 1994, when Defendant Wright requested that Hamlin cover for Captain Bielby, who was working shift, Hamlin stated that he could not because his doctor would not let him. (Plaintiffs' Ex. 4). Consequently, Defendant Wright asked Hamlin to provide him with a copy of this doctor's opinion since there was nothing in the Fire Department's files which indicated that Hamlin was not able to cover for a firefighter.[10] (*Id.*). Hamlin responded to this request with a May 11, 1994 letter to a Doctor Modi from a Doctor Amlani in which Doctor Amlani determined that Hamlin's functioning as an assistant fire chief and doing intermittent or infrequent duties of a fireman may be acceptable. (*Id.*). In light of this letter, Defendant Wright sent Hamlin home to obtain a statement from his doctor to the Township which would allow the Fire Department to return him to work without restrictions. (*Id.*). Hamlin then obtained a letter from Doctor Modi dated September 19, 1994 which did not allow Hamlin to return to work without restrictions because it states that Hamlin is "to avoid heavy lifting and strenuous work ... due to the possibility of recurrent cardiovascular problems." (*Id.*). Based upon this letter, on September 19, 1994, Defendant Wright relieved Hamlin of duty until he was medically able to perform what Wright deemed Hamlin's essential job functions. (*Id.*).

As a result of this action, Plaintiffs allege that Defendant Wright changed the job duties and functions required of the Assis-

tant Fire Chief. Specifically, Plaintiffs assert that Defendant Wright changed the job so as to require the Assistant Fire Chief to participate actively, when necessary, in responding to calls, driving a truck, and fighting fires. In response, Defendants argue that no such changes were made, as the April 1992 job description of the Assistant Fire Chief position required Hamlin to "[r]espond to alarms and special calls and assume command of operations if required." (*See* Def. Ex. D). The Township Supervisor, Defendant Joseph, has explained that this responsibility means that the Assistant Fire Chief must be prepared to do all things necessary to fight fires, including pulling hoses and carrying people out of buildings. (*See* Def. Ex. D and Ex. E). Further, Defendant Wright has stated that "assum[ing] command of operations" includes working a shift when another firefighter is absent or needs temporary coverage, (Plaintiffs' Ex. 5, G. Wright Deposition, pp. 62–63), and generally doing whatever is necessary for the proper functioning of the Fire Department, (G. Wright Deposition, p. 114).

Because of his cardiac condition, resulting from his September 1992 heart attack, Hamlin admits that he is unable to perform these job duties regularly. (Def. Ex. A, R. Hamlin Deposition, Vol. I, p. 44). Accordingly, on September 20, 1994, Hamlin submitted an Accommodation Request to the Township. (Def. Ex. F). In that request, Hamlin asked the Township to allow him to remain as Assistant Fire Chief without requiring him to participate in responding to calls.

On October 4, 1994, the Township denied this request reasoning that the limited budget of the Township, the small size of the Fire Department, its volume of calls[11], and the duty of the Township and the Fire Department to protect the welfare of the community, made the Township unable to permit Hamlin to remain as Assistant Fire Chief while allowing him to relinquish his firefighting duties permanently. (Joseph Deposition, pp. 17, 29, 38, 39, 49, 96). Accordingly, with-

---

10. Fire Chief Rowley never made a written record of Hamlin's statement regarding his inability to cover for someone working shift. (Plaintiffs' Ex. 7, Rowley affidavit, p. 2); (G. Wright deposition, p. 54).

11. Defendant Wright, the Fire Chief, estimated the annual number of calls at approximately 1,400 in 1995. (G. Wright deposition, p. 92).

in one month of this decision, Hamlin applied for, and accepted, a total and permanent disability retirement. (Def. Ex. A, R. Hamlin Deposition, Vol. I, pp. 128, 134). His application for this disability retirement consisted of: (1) an October 12, 1994 handwritten letter to the Township Retirement Board in which he requested that the Board begin the initial process of disability retirement for him, (Plaintiffs' Ex. 9), and (2) checking a box on a form that indicated he had been turned down for a job due to a disability and signing that same form as further indication that he was applying for disability certification.

Hamlin's disability retirement and its associated procedures are governed by M.C.L. § 38.556(2)(d).[12] The statute provides that for duty disability pension:

> [u]pon the application of a member [of the state employees retirement system], or his department head, a member who becomes totally incapacitated for duty by reason of a personal injury or disease occurring as the natural or proximate result of causes arising out of and in the course of his employment by the city, village, or municipality shall be retired by the retirement board. After a medical examination of a member made by a medical committee, consisting of a physician named by the retirement board, a physician named by the member claiming benefits, and a third physician designated by the first 2 physicians named, the medical committee, by a majority opinion, shall certify in writing (1) that the member is mentally or physically incapacitated for the further performance of duty as a policeman or fireman in the service of the city, village, or municipality, (2) that the incapacity is likely to be permanent, and (3) that the member should be retired.

M.C.L.A. § 38.556(2)(d).

Thus, in connection with Hamlin's disability retirement, 3 physicians examined him. These physicians concurred that it may be acceptable for Hamlin to serve as an Assistant Fire Chief provided he: (1) avoided heavy lifting and strenuous work on a daily basis, as well as 24–hour work shifts; or (2) avoided the strenuous activities associated with being a firefighter, including actual firefighting, and performed only the lighter job of Assistant Fire Chief; or (3) was not employed as a firefighter. (Plaintiffs' Exhibits 10, 11, 12, respectively).

Apparently satisfied that these physicians' statements met M.C.L. § 38.556(2)(d), the Township Retirement Board determined on December 22, 1994 that Hamlin was eligible for disability retirement and granted it to him. Since then, Hamlin has received compensation for his retirement pursuant to § 38.556(2)(d).

Meanwhile, On September 20, 1994, Hamlin filed charges of handicap discrimination with the Equal Employment Opportunity Commission (the "EEOC") and the Michigan Department of Civil Rights. The EEOC issued Hamlin a "right to sue" letter on August 3, 1995. Thereafter, on October 27, 1995, Plaintiffs filed this lawsuit alleging that Defendants violated the ADA, the MHCRA, and the public policy of the State of Michigan. Further, Hamlin's wife, Jeanne, has filed a loss of consortium claim.

### III. ANALYSIS

#### A. Standards Applicable to Motions for Summary Judgment.

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a sum-

---

**12.** The statute, in portions not relevant here, is amended by the collective bargaining agreement between the Township Board and Firefighters Local 1425.

mary judgment motion.[13] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

\* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

**B.** ***Prima Facie Cases and Burdens of Proof under the ADA and the MHCRA.***

In order to bring a discrimination claim under the ADA and to survive a defendant's motion for summary judgment, a plaintiff must demonstrate a prima facie case.[14] *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996). Thus, a plaintiff must show that: "(1) he is an individual with a disability; (2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and (3) he was discharged solely by reason of his handicap." *Id.* (citations omitted). When a plaintiff alleges that he or she is the victim of discriminatory treatment, he or she may establish a prima facie case of discrimination with direct evidence; or the plaintiff may introduce indirect evidence of discrimination and proceed under the *McDonnell Douglas*[15] burden-shifting regime that courts often apply in workplace discrimination cases. *Monette*, 90 F.3d at 1178.

**1. The *Monette* Approach, Not *McDonnell Douglas* Controls *the Instant Matter.***

When an employer acknowledges that it relied upon the plaintiff's handicap in mak-

---

**13.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

**14.** Claims of handicap discrimination under Michigan law essentially track those under Federal law. *See Sandison v. Michigan High School Athletic Ass'n*, 863 F.Supp 483, 487 (E.D.Mich. 1994), *rev'd on other grounds*, 64 F.3d 1026, 1035–37 (6th Cir.1995). Therefore, resolution of this summary judgment motion with respect to the ADA claim will also resolve the summary judgment motion with respect to the MHCRA claim. *See Ashworth v. Jefferson Screw Products, Inc.*, 176 Mich.App. 737, 440 N.W.2d 101, 104–05 (1989). *See also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178, fn. 3 (6th Cir.1996). Although this conclusion may be unwarranted in certain fact-specific cases, *Monette*, 90 F.3d at 1184 fn. 10, it does in fact apply to the instant matter, *see* III.B.2.c and III.C, *infra*.

**15.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

ing the contested employment decision, the *McDonnell Douglas* burden shifting analysis is inappropriate because the employer has effectively admitted its intent, and therefore, the plaintiff has direct evidence that the decision in question was based upon the plaintiff's disability. *Monette*, 90 F.3d at 1182.

In the instant matter, Defendants admitted in their motion that Hamlin was "remov[ed] ... from active service ... in response to his statements that he cannot be depended upon to respond to calls on a continual basis." This removal, therefore, necessarily relied upon Hamlin's disability because his disability was the reason why Hamlin made those statements. Furthermore, neither party disputes that Hamlin is disabled for purposes of the ADA. Thus, at this stage, the Court will follow the *Monette* approach and not apply the *McDonnell Douglas* burden-shifting regime.

### 2. *Defendants Bear the Burden of Proving that the Challenged Job Requirement is an Essential Function.*

■ Here, Plaintiffs argue that one of the purported job functions of the Assistant Fire Chief—that of having to occasionally fill-in for other fireman and work shift—is not an essential function of the job and that, absent this function, Hamlin is able to perform all of the functions of the position.

In *Monette*, the Sixth Circuit held that under the ADA, when a plaintiff challenges a job function as being unessential to the job as a whole, it is the employer who bears the burden of proving that the challenged function is essential. *Monette*, 90 F.3d at 1184. In assigning this burden to the employer, the *Monette* panel relied upon a provision in the ADA (42 U.S.C. § 12112(b)(6)) which prohibits employers from adopting or using job criteria which are inconsistent with job necessity and would screen out, or tend to screen out, persons with a disability. From this provision, the panel moved directly to the conclusion that the burden is on the

employer to prove that a particular job requirement is an essential function of the job. (The panel does add that the plaintiff nevertheless "retains the burden of proving that he or she is qualified to perform the essential functions of the job absent the challenged job requirement." *Id.* at 1184.)

### a. Problems Inherent in Defendants' Bearing This Burden.

The problem with this analysis is two-fold. First, it equates a statutory prohibition (i.e., no unlawful or pretextual screening mechanisms) with the creation of a legal burden. The mere fact that an act is prohibited does not place the burden of proving that it was not done upon the one accused of doing it. Here, Plaintiffs simply challenging a job function as unessential (and, presumably, pretextual) should not be equated with requiring the employer to prove it is essential. To do so effectively turns on its head the burden of proof in an ADA case because rather than the plaintiff being required to show that he or she is capable of performing all of the essential functions of a job, all he or she need do is challenge the essentiality of one of the job functions and, thereby, shift the burden of proof on one of the critical factors for showing that he or she is qualified for the job.[16] Such a shift is clearly unwarranted because it allows a plaintiff to avoid making his or her prima facie case.

Just as importantly, the *Monette* analysis ignores the clear import of the regulations promulgated under the ADA with respect to the definition of an essential function and the provision upon which the panel relied. Specifically, the appendix to the regulations dealing with essential functions and qualification standards, tests, and other selection criteria provides: "[i]t is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards." 29 C.F.R. Pt. 1630.2(n) App.; 29 C.F.R. Pt. 1630.10 App.

---

**16.** The difficulty with the panel's reasoning can be readily seen by simply extending the holding to its logical conclusion. Assume a plaintiff employee were to challenge 3 of 6 job functions as "unessential"—or even all of the functions. Un-

der the *Monette* panel's decision, the defendant employer would then have the burden of proving that each of these functions was essential to the job—thus completely shifting the burden of proving qualification.

Pretty clearly, placing the burden on the employer to show a certain job function is essential would place courts and jurors in the position of second-guessing an employer's business judgment as to what the essential functions of a job are, without even requiring the plaintiff challenging the function to first come forward with evidence that the function is not essential.

The *Monette* burden-shifting analysis with respect to essentiality under the ADA becomes even more problematic as the Sixth Circuit apparently purports to import that standard into the MHCRA as well.[17] Arguably, Michigan courts have made it clear that the plaintiff in a MHCRA case retains the burden of proof on *all* qualification issues, including the essentiality of a job function. *See, Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1332 (6th Cir.1989) (under the MHCRA, plaintiff employee has the initial burden of proving that the defendant employer violated the Act); *Crittenden v. Chrysler Corp.*, 178 Mich.App. 324, 330–31, 443 N.W.2d 412, 415 (1989).[18] Moreover, while federal precedent dealing with questions of discrimination in employment may be persuasive, it is not binding on a Michigan court reviewing a claim under a Michigan statute, *Northville Public Schools v. Michigan Civil Rights Commission*, 118 Mich.App. 573, 576, 325 N.W.2d 497, 498 (1982); *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419, 426 (1984), especially where the federal pre-

cedent is logically suspect. However, whether this Court agrees with (or whether a Michigan court would agree with) the *Monette* approach, it is apparently the law of the Sixth Circuit with respect to the ADA and the MHCRA that the employer bears this burden, and the Court must apply that law.

### b. Determining What Is an Essential Function.

An essential function for both the ADA and the MHCRA means the "fundamental job duties" of a position, not those that are "marginal". 29 C.F.R. § 1630.2(n)(1) The Regulations provide that one may consider a function essential for many reasons, including, but not limited to, those situations in which:

... the reason the position exists is to perform that function; ... the ... number of employees available among whom the performance of that job function can be distributed [is limited]; and/or [t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2)(i–iii).

To prove that a job function is essential, one may, among other facts and circumstances, rely on:

(i) ... [one's] judgment as to which functions are essential; (ii) [w]ritten job de-

---

**17.** In *Monette*, the panel noted that because claims of handicap discrimination under Michigan law essentially track those under federal law, its resolution of Monette's claim under the federal statute also dispensed with his claim under the MHCRA. *Monette*, 90 F.3d at 1178 fn. 3. Moreover, the panel only distinguished the ADA from the MHCRA with respect to the burdens of proof for showing that an accommodation would impose an undue hardship. Specifically, the panel noted that under the ADA, the plaintiff has an initial burden of showing that a reasonable accommodation is possible. If the plaintiff meets this burden, then the defendant employer has the burden of persuading the fact finder that the proposed accommodation would impose an undue hardship. However, the panel noted that under the MHCRA, this burden on the defendant employer is only one of production, not persuasion. Thus, for a MHCRA claim, if the employer satisfies its burden of production on the undue hardship issue, the plaintiff employee bears the ultimate burden of persuading the fact finder

that the proposed accommodation would not impose an undue hardship upon the employer. *Id.* at 1184 fn. 10. Presumably then, under *Monette*, the other burdens of proof in ADA and MHCRA cases are identical.

**18.** In *Crittenden*, the Michigan Court of Appeals held that under the MHCRA, once a plaintiff proves, as part of his or her prima facie case, that he or she is handicapped and that the handicap does not affect his or her ability to perform the duties of a particular job, then the burden of proof shifts to the defendant to show a legitimate, non-discriminatory reason for its action. *Crittenden*, 178 Mich.App. at 331, 443 N.W.2d at 415. Thus, in *Crittenden*, the plaintiff specifically bore the burden of proving that his handicap was unrelated to his ability to perform the duties of the job in question. 178 Mich.App. at 332, 443 N.W.2d at 416. Implicitly then, this burden included proving what the essential functions of the job were.

scriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job; and/or (vii) [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i–vii).

### c. Defendants Have Failed to Meet Their Burden on the Essential Function Issue.

On the record currently before the Court, Defendants have offered evidence on three of these factors to support their position that temporarily filling in for a firefighter working shift is an essential function of the Assistant Fire Chief position. Plaintiffs, meanwhile, have offered evidence on two of these factors to suggest that this function is unessential.

First, Defendants rely on the April 1992 job description of the Assistant Fire Chief position, which requires "[r]espond[ing] to alarms and special calls and assum[ing] command of operations if required." (*See* Def. Ex. D). Second, the Township Supervisor, Defendant Joseph, has explained that this responsibility means that the Assistant Fire Chief must be prepared to do all things necessary to fight fires, including pulling hoses and carrying people out of buildings. (*See* Def.Ex. D and Ex. E). Likewise, Defendant Wright has stated that this responsibility includes working shift when another firefighter is absent or needs temporary coverage, which may require being a primary responder at the scene of a fire, (Plaintiffs' Ex. 5, G. Wright Deposition, pp. 62–63), and generally doing whatever is necessary for the functioning of the Fire Department, (G. Wright Deposition p. 114). Finally, Defendants assert that limited resources, the small size of the Fire Department, the volume of calls the Fire Department receives, and the necessity of protecting the welfare of the

community, make the Township unable to permit Hamlin to remain as Assistant Fire Chief while allowing him to cease filling in for others who are working shift. (Joseph Deposition, pp. 17, 29, 38, 39, 49, 96).

Plaintiffs, however, have offered evidence which suggests that filling in for firefighters working shift is not an essential function of the Assistant Fire Chief position. First, Hamlin's predecessor in the Assistant Fire Chief position, Gregg Nordman, has stated that after 1985 he was not required to work shift, and as a result, when he occasionally volunteered to work shift, other full-time firefighters, including Defendant Wright, objected—presumably because they wanted the overtime for themselves. (Plaintiffs' Ex. 17, Nordman affidavit, p. 2). Further, Plaintiffs point out that Defendant Wright does not know how many times Hamlin's successor, Assistant Fire Chief Ron Csiky, has been required to work shift since Hamlin was terminated. (G. Wright Deposition, pp. 24–25). Finally, Plaintiffs rely on Nordman, Hamlin and Csiky's experiences to suggest that the amount of time spent performing this function is not significant, because it is generally an infrequent duty, albeit one that could potentially arise regularly. (G. Wright Deposition, pp. 24–25, 92–93, 101–02, 114, 116–18).

Given this factual record, the Court concludes that there is a material question of fact as to whether filling in for another firefighter is an essential function of the Assistant Fire Chief position. Thus, under *Monette*, Defendants have not met their burden of persuasion on this essential function question. The Court, therefore, must deny Defendants' summary judgment motion as to Plaintiffs' claims under both the ADA and the MHCRA.[19]

### C. Defendants Joseph and Wright May Be Sued Individually in Their Official Capacity.

Defendants have argued in their summary judgment motion that Defendants Joseph and Wright cannot be liable under the

---

**19.** The Court, therefore, does not reach the question of whether Plaintiffs' proposed accommodation is objectively reasonable because it is Plain-

tiffs' position that the function at issue is not essential.

ADA because they are individual defendants. However, as Plaintiffs indicate in their Response, Plaintiffs are, under both the ADA and the MHCRA, suing Defendants Joseph and Wright not as individuals in their individual capacity, but as individuals in their official capacity because they are, as Township Supervisor and Fire Chief respectively, agents of the Township. (*See* Plaintiffs' Response, p. 15–16.). Consistent with the other workplace discrimination statutes, Defendants Joseph and Wright may be sued individually in their official capacity under both the ADA and the MHCRA. *See, e.g., Shpargel v. Stage & Co.,* 914 F.Supp. 1468, 1478 (E.D.Mich.1996); *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362 (6th Cir.1982). Thus, Defendants' motion for summary judgment on this ground as to the individual Defendants Joseph and Wright must be denied.

### D. *Material Issues of Fact Do Not Exist as to Whether Hamlin's Termination Was in Violation of Public Policy.*

■ Plaintiffs claim that when the Defendant Township and the Defendant Fire Department terminated Hamlin, they violated the First Amendment and the public policy of the State of Michigan because they were retaliating against him for engaging in constitutionally protected activities, including: negotiating a salary for his promotion to Fire Chief; his statements to the press about these negotiations; and his challenging Defendant Wright's selection as Fire Chief.

■ To plead a prima facie case that he or she was fired in violation of his or her First Amendment rights, a government employee must establish that: (1) his or her speech can be fairly characterized as speech on a matter of public concern and (2) his or her speech was at least a substantial or motivating factor in his discharge; the former is a question of law, while the latter is a question of fact. *See, e.g., Marohnic v. Walker,* 800 F.2d 613, 615–16 (6th Cir.1986); *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996); *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Mt. Healthy City School District Board of Education v.*

*Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

■ If the government employee makes out this prima facie case, the government employer may rebut the employee's case by demonstrating either that it would have made the same decision in the absence of the protected conduct or by showing that the employee's conduct interfered with its effective and efficient fulfillment of its responsibilities to the public. *See, e.g., Frank v. Relin,* 1 F.3d 1317, 1329 (2d Cir.1993); *Mt. Healthy City School District Board of Education,* 429 U.S. at 286, 97 S.Ct. at 575; *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692.

In their response to Defendants' motion for summary judgment, Plaintiffs contend that: (1) Hamlin's efforts to negotiate a salary package for the Fire Chief position were protected by his constitutional rights to free speech and association; (2) his comments to the press about his frustration in not being able to come to terms for the Fire Chief job with Township officials were similarly protected; and (3) his challenge to the eligibility of Defendant Wright for the position of Fire Chief was also similarly protected. Thus, Plaintiffs allege that to the extent Defendants were motivated by this supposedly protected behavior to terminate Hamlin, Defendants violated the First Amendment and the public policy of the State of Michigan.

Defendants, however, state in their summary judgment motion that Plaintiffs' allegations about Defendants' motivations in terminating him are based on assumptions and "gut feelings" that are not supported by fact. Further, Defendants assert that because Plaintiffs have failed to identify specifically the comments or actions which they believe form the basis of this Count III of the Complaint, the Court should preclude them from moving forward on these claims.

Based on their arguments, Plaintiffs have failed to establish a prima facie case of a termination in violation of the First Amendment and the public policy of the State of Michigan. Plaintiffs have offered no evidence that Hamlin's allegedly protected activity was a substantial or motivating factor in his termination. Plaintiffs' conclusory assertions without any supporting evidence in

the record are not enough to meet this initial burden. Further, even if the Court were to find that Plaintiffs have met this burden, Defendants have likely rebutted it because Defendants have offered evidence in the record to suggest that, regardless of Hamlin's allegedly protected activity, Defendants still would have terminated him because of his inability to work without restrictions and his refusal to cover or fill-in for firefighters working shift. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim of termination in violation of the First Amendment and the public policy of the State of Michigan.

**E. The Effect of Hamlin's Requesting and Receiving Permanent and Total Disability Payments on His ADA and MHCRA Claims.**

■ When the Township determined that it is was unable to permit Hamlin to remain as Assistant Fire Chief if he had to relinquish permanently his firefighting duties, Hamlin applied for, and accepted, a total and permanent disability retirement. Based on his applying for and receiving disability retirement, Defendants argue (1) that Hamlin has waived his statutory rights under the ADA and the MHCRA; and (2) that having admitted that he is disabled and incapable of performing what Defendants deem the essential functions of the Assistant Fire Chief position, Hamlin has further admitted that he is not "qualified" for the Assistant Fire Chief position under the ADA and the MHCRA.

The Sixth Circuit has held that public policy weighs in favor of allowing employees to release their rights under workplace discrimination statutes. *See Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir.1989). However, the Court has formulated a two-step review procedure for evaluating the validity of waivers. First, a court must determine whether the agreement was signed in an atmosphere not inherently coercive and in an effort to settle legitimate differences. *Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1045 (6th Cir.1986), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). Indeed, a court should not allow an employer to circumvent the policies of the

underlying workplace discrimination statute by taking advantage of its superior bargaining power. *Id.* at 1044–45. Second, if the situation is not inherently coercive, then the court should examine the waiver under normal contract principles. *Shaheen*, 873 F.2d at 107.

In its summary judgment motion, Defendants allege that because Hamlin applied for and received permanent and total disability payments, he has waived any allegedly implicated statutory rights under the ADA and the MHCRA. To support this allegation, Defendants rely on *Thompson v. Plante & Loran*, 897 F.Supp. 1010 (W.D.Mich.1995) (slip opinion), which cited and applied *Shaheen*. In *Thompson*, the plaintiff had entered into a disability retirement agreement ("DRA") in which he represented that he was totally disabled. Although the DRA contained no specific release language, the Court held that:

> ... plaintiff's voluntary and fully informed entry into the DRA constituted a knowing waiver of any allegedly implicated statutory rights under the ADA or MHCRA.

The Court, relying on *Shaheen*, reasoned that because of the DRA, the case was actually a contract dispute and should be treated as such consistent with public policy and normal contract principles. The Court further reasoned that the Michigan Supreme Court would also follow this analysis under the MHCRA, given that it had followed this same analysis under Title VII.

Plaintiffs object to applying *Thompson* to the instant matter because Hamlin, as a condition for processing his worker's compensation benefits when he was placed off-duty by Defendant Wright, was required by Defendants' carrier to make application for a disability retirement. (Plaintiffs' Ex. 15, R. Hamlin Deposition, pp. 127–28). Plaintiffs assert that although Hamlin made this application, he did not represent that he was permanently disabled. In fact, in connection with his disability retirement application, 3 physicians concurred that it may be acceptable for Hamlin to serve as an Assistant Fire Chief provided he: (1) avoided heavy lifting and strenuous work on a daily basis, as well as 24–hour work shifts; or (2) avoided the

strenuous activities associated with being a firefighter, including actual firefighting, and performed only the lighter job of Assistant Fire Chief; or (3) was not employed as a firefighter. (Plaintiffs' Exhibits 10, 11, 12, respectively).

Moreover, Plaintiffs argue that Hamlin never represented or agreed that he would be deemed retired. In fact, Plaintiffs state that through their own Retirement Board, Defendants determined that Hamlin was eligible for a disability retirement. Thus, Plaintiffs assert that Defendants cannot now cite their own determination of disability status as a shield.

The Court agrees with Plaintiffs because the instant matter is readily distinguishable from *Runyan, Shaheen,* and *Thompson.* In *Runyan,* there was a waiver agreement and the employee who signed it was an experienced labor lawyer. Moreover, in *Shaheen,* the terminated employee, after 3 months of deliberation, choose between two severance pay plans, selecting the more generous plan which included a waiver clause. Similarly, the employee in *Thompson* also negotiated and signed an agreement.

Hamlin, however, never signed nor negotiated an agreement. He merely initiated an application process that later concluded he was totally disabled. Further, this process appears to have been performed insufficiently, as the 3 doctors comprising the medical committee did not in their letters specifically make the findings that are required under M.C.L. § 38.556.[20] Nevertheless, the Retirement Board declared Hamlin retired anyway. Thus, in the absence of a negotiated and signed agreement by Hamlin and the Township, this Court will not first imply a contract and then imply a waiver when the underlying transaction is a disability retirement determination insufficiently made by a municipal township retirement board pursuant to a state statute. To hold otherwise may permit the Township to use its bargaining power and boilerplate statutory provisions to deny an employee his rights under the ADA and the MHCRA.

■ Defendants, however, also argue that Hamlin's applying for and receiving disability retirement constitute admissions under the ADA and the MHCRA that he is not qualified for the Assistant Fire Chief position. This argument fails for two reasons. First, to the extent that Hamlin admitted anything, it was in regard to filling-in for firefighters working shift. Whether or not this duty is an essential function of the Assistant Fire Chief position is a question of material fact, as the Court discussed earlier.

Second, it is disingenuous for Defendants to assert that Hamlin has admitted that he is disabled, and thus, not qualified for the Assistant Fire Chief position due to his applying for and accepting disability retirement. As discussed above, all that Hamlin did was to file an application requesting that the Township begin the initial process of disability retirement; check a box on a form indicating that he had been turned down for a job due to a disability; and sign that same form as further indication that he was applying for disability certification. In fact, as also discussed above, it was Defendants who determined, pursuant to an insufficiently performed statutory procedure, that Hamlin was a candidate for and deserving of disability retirement. On these facts, this Court cannot hold as a matter of law that Hamlin has admitted that he is not qualified for the Assistant Fire Chief position under the ADA and the MHCRA. Thus, Defendants' motion on these grounds for summary judgment must also be denied.

## IV. CONCLUSION

For the foregoing reasons, this Court holds that: (1) there is a material question of

---

20. The medical committee should have certified in writing (1) that Hamlin was mentally or physically incapacitated for the further performance of duty as the Assistant Fire Chief, (2) that the incapacity was likely to be permanent, and (3) that Hamlin should be retired. Instead, the medical committee concurred that it may be acceptable for Hamlin to serve as an Assistant Fire Chief provided he: (1) according to Dr. Amlani, avoided heavy lifting and strenuous work on a daily basis, as well as 24–hour work shifts; or (2) according to Dr. Friedman, avoided the strenuous activities associated with being a firefighter, including actual firefighting, and performed only the lighter job of Assistant Fire Chief; or (3) according to Dr. Rag, was not employed as a firefighter. (Plaintiffs' Exhibits 10, 11, 12, respectively).

fact regarding the essential function issue on Plaintiffs' ADA and MHCRA claims; (2) Defendants Joseph and Wright may be sued as individuals in their official capacities under the ADA and the MHCRA; (3) Plaintiffs have failed to establish a prima facie case of termination in violation of public policy; and (4) Hamlin did not waive his rights under the ADA and the MHCRA or admit that he was not qualified under the ADA and the MHCRA for the Assistant Fire Chief position when he applied for and accepted disability retirement.

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be DENIED IN PART and GRANTED IN PART.