CHMIELEWSKI v XERMAC, INC

Docket No. 106499. Argued January 7, 1998 (Calendar No. 15). Decided
June 9, 1998.

Gary P. Chmielewski brought an action in the Oakland Circuit Court
under the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.*; MSA
3.550(101) *et seq.*, against his former employer, Xermac, Inc., alleg-
ing that his employment was terminated to avoid continued health
insurance premium increases caused by a liver transplant and the
need to take costly antirejection medication. He further alleged
wrongful discharge pursuant to *Touissant v Blue Cross & Blue
Shield of Michigan*, 408 Mich 579 (1980). The court, Francis X.
O'Brien, J., dismissed the wrongful discharge claim because the
plaintiff was an employee at will. Thereafter, he entered judgment
on a jury verdict for the defendant. The Court of Appeals,
MacKenzie, P.J., and J. P. O'Brien, J. (Fitzgerald, J., concurring in
part and dissenting in part), affirmed, holding that the trial court
did not err in refusing to instruct the jury that it should consider
the plaintiff's condition without the benefit of his antirejection
medication. Nor did the trial court err in allowing evidence regard-
ing the plaintiff's alcoholism and the defendant's economic condi-
tion (Docket No. 162968). The plaintiff appeals.

In an opinion by Chief Justice MALLETT, joined by Justices
BRICKLEY, BOYLE, WEAVER, and TAYLOR, the Supreme Court *held*:

Because the plain language of the Handicappers' Civil Rights Act
requires that a person actually have a determinable characteristic
that substantially limits a major life activity, the trial court did not
err in refusing to give the plaintiff's requested special jury instruc-
tion. Nor did the court err in admitting evidence of the plaintiff's
alcoholism and the defendant's economic condition.

1. The Handicappers' Civil Rights Act prohibits discrimination
against persons because of handicapped status and mandates their
employment to the fullest extent reasonably possible. To prove dis-
crimination, a plaintiff must show a handicap as defined in the act,
that the handicap is unrelated to the ability to perform job duties,
and discrimination as delineated in the statute. To be handicapped,
a person must have a determinable physical or mental characteris-
tic that substantially limits a major life activity unrelated to the

ability to perform the duties of a particular job. Handicap does not include a determinable physical or mental characteristic caused by the use of alcohol, if that physical or mental characteristic prevents a person from performing the duties of the job.

2. A person's handicapped status should be examined as it exists presently, case by case. By limiting the act's protection to persons having conditions that actually impose substantial limitations, the standard for determining a handicap preserves the high purpose of the act. If the burdens associated with the use of medications, prosthetic devices, or other mitigating measures are sufficiently great, the definition will be met. Courts must carefully analyze each person and must not categorically apply the definition to a given diagnosis. In this case, the plaintiff's condition, examined as it exists with the benefit of antirejection medication, reveals no limitation of any major life activity. Thus, the plaintiff is not handicapped. Because the law requires the factfinder to assess a person's condition as it actually exists, the trial court did not err in refusing to give the plaintiff's requested instruction.

3. The trial court also did not err in admitting evidence of the plaintiff's alcoholism and of the defendant's financial status. The evidence of alcoholism was relevant to whether his condition met the act's definition of handicap and to the issue of damages, and the court cautioned the jury regarding the appropriate use of the evidence. The probative value of the evidence was not substantially outweighed by its prejudicial effect. The evidence of the defendant's financial condition tended to disprove that the plaintiff was fired because of his alleged handicap.

Affirmed.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that the failure of the trial court to give plaintiff's proposed instruction resulted in substantial injustice.

If a jury is to perform its function properly, it must receive correct instructions regarding the law on the effect of mitigating measures. Generally, a decision that an instruction is accurate and applicable to a case is within the sound discretion of the trial court. While a trial court has the discretion to give an instruction not included in the Standard Jury Instructions, that discretion is limited by the duty to assure that the instructions given accurately state the law.

When assessing handicap status under Michigan's Handicappers' Civil Rights Act, a court should consider a person's condition as it would exist without regard to medication or other mitigating measures. Factors to be considered are the nature of the impairment, its severity, its duration or expected duration, and its long-term effect.

The existence of an impairment should be determined without
regard to mitigating measures such as medicines.

Merely because plaintiff in this case is able to control his condi-
tion with medication does not mean that the condition does not
substantially limit a major life activity. The requested jury instruc-
tion simply clarified that control of a determinable physical condi-
tion with medication does not disqualify an otherwise qualified per-
son from handicap status. By narrowing the class of persons quali-
fied as handicapped, the majority contracts the intent of the
Legislature in enacting the HCRA.

216 Mich App 707; 550 NW2d 797 (1995) affirmed.

*Malley & Fett, P.C.* (by *James K. Fett* and
*Marla A. Linderman*), for the plaintiff.

*Kerr, Russell & Weber, P.L.C.* (by *Daniel G. Beyer*
and *Joseph K. Grekin*), for the defendant.

Amicus Curiae:

*Stewart R. Hakola, Mary J. Michalak,* and *Gayle C.
Rosen,* for Michigan Protection & Advocacy Service.

MALLETT, C.J. This Handicappers' Civil Rights Act[1]
suit involves the question whether, in considering if a
person has a condition that meets the act's definition
of "handicap," the trier of fact should assess the indi-
vidual without the benefit of medication or other miti-
gating measures, or if it should assess the individual's
condition as it presently exists with the benefit of
such measures. The act requires that to qualify as
having a "handicap" for purposes of coming within
the act's protection, an individual must have a deter-
minable physical or mental characteristic that sub-
stantially limits a major life activity. Plaintiff, who
underwent a liver transplant and is dependent on
antirejection medication, argues that the trial court

[1] MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*

erred in refusing to give the jury a special instruction to the effect that it should consider his condition without the benefit of his antirejection medication. Because we disagree and find that the requested instruction contravenes the plain language of the statute, we affirm the Court of Appeals affirmance of the jury verdict for the defendant. We also affirm the Court of Appeals holding that the trial court did not err in admitting evidence of the plaintiff's alcoholism and of the defendant's economic condition.

I

FACTS AND PROCEEDINGS

The plaintiff began working as a salesperson for defendant Xermac, a supplier of sophisticated electronic machinery, in the fall of 1985. His duties also included demonstrating and installing machinery. Plaintiff is an alcoholic, although his alcoholism apparently had little or no effect on his ability to perform his job functions.[2] His alcoholism did, however, have an effect on his liver. In 1988, plaintiff learned that he had cirrhosis of the liver and underwent a lifesaving liver transplant.

He returned to his job in December, 1989, after a six-month medical leave of absence. On January 29, 1990, he signed a sales agreement, in which he agreed to a decrease in his sales territory from a multistate

---

[2] Plaintiff might be described as a "functional alcoholic." Although his alcoholism did not generally interfere with his job, he did have two episodes at work related to his alcoholism. One occurred shortly before his liver transplant when he was making a call on a General Motors customer in Bay City, Michigan. He apparently lost consciousness during this call and was taken to a General Motors medical facility. The other incident involved feelings of faintness while on a call in Indianapolis, Indiana.

region to an exclusive right for sales in Michigan, an increase in his commission rate for sales, a car allowance, and sales quotas. While he had periodically signed similar agreements while with Xermac, this was apparently the first time the company had included sales quotas. When he signed the document, the plaintiff added his own comment indicating his concern about meeting the sales quotas.[3] The plaintiff alleged at trial that his supervisors also began to criticize his work for the first time during the period after his return. In June, 1990, the defendant terminated the plaintiff's employment, citing his failure to meet the sales quotas delineated in the January, 1990, agreement.

The plaintiff brought this employment discrimination suit and later added a claim for wrongful discharge pursuant to *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980). The defendant moved for summary disposition on both claims. The trial court, finding that plaintiff was an employee at will, dismissed the *Toussaint* claim. The court allowed the discrimination claim to go forward, finding that there were material issues of fact regarding whether the plaintiff came within the protection of the Handicappers' Civil Rights Act.

The plaintiff's theory at trial was that the defendant employer terminated him in violation of the HCRA to avoid continued health insurance premium increases caused by the liver transplant and his need to take costly antirejection medication for the rest of his life. The plaintiff testified at trial that the plant manager,

---

[3] The plaintiff added this statement, "[b]ecause of my absence, the increased competition, and economic climate, I have concerns about meeting these quotas."

John Purrett, visited him at his home while on medical leave and informed him that Xermac's president, Pete Schmitt, wanted to terminate him because of the increased medical insurance costs.[4] Mr. Donald Shaver, Xermac's general manager and the plaintiff's immediate supervisor, also testified that at several meetings he and Mr. Schmitt had discussed the matter of the plaintiff's medical bills contributing to the company's increased insurance costs.[5]

The defendant countered plaintiff's HCRA suit by arguing (1) that the plaintiff does not come within the HCRA's protection because he is not handicapped, and (2) that the plaintiff was not terminated because of an alleged handicap, but because of economic necessity. Regarding the first argument, the defendant pursued two lines of defense. First, the act requires that to be handicapped one must be substantially limited in a major life activity. MCL 37.1103(e)(i)(A); MSA 3.550(103)(e)(i)(A). The defendant argued that since the lifesaving operation, the plaintiff has no limitation in any life activities and consequently cannot claim

---

[4] The record discloses that the plaintiff's liver transplant cost the defendant's medical insurer more than $130,000 and that the continuing costs related to the antirejection medications are approximately $700 a month. Mr. Purrett testified that the medical procedures and medications caused the defendant's health insurance premiums to increase by approximately $15,000 a year.

[5] The defendant, however, presented evidence that increased insurance costs were not the reason for the discharge. For example, Mr. Schmitt testified that he was not aware that a liver transplant caused the insurance premiums to increase by a specific amount. The defendant also presented a chart showing a comparison of monthly premiums billed for certain Xermac employees. This chart revealed that while the premiums billed for the plaintiff more than doubled between 1988 and 1990, similar or even greater increases in premiums occurred for other employees. The chart also indicated that premiums for at least six other employees were significantly higher than those for the plaintiff.

handicapped status.[6] Second, the defendant points out
that the HCRA excludes from the definition of handi-
cap, conditions caused by the use of alcohol that pre-
vent an individual from performing the duties of his
job. MCL 37.1103(f)(ii); MSA 3.550(103)(f)(ii). The
defendant argued that because the plaintiff's alcohol-
ism necessitated the liver transplant, any claimed
handicap flowing from the liver transplant falls
outside the act's protection.

During the trial, the plaintiff sought to exclude evi-
dence relating to his alcoholism and cirrhosis. He
argued that it was not relevant because it did not pre-
vent him from performing his job functions and that
even if it was relevant, its prejudice outweighed any
probative value. The trial court disagreed and denied
the plaintiff's motion.

The plaintiff also sought to exclude evidence
regarding the defendant's economic condition, argu-
ing that the defendant was attempting to assert an
economic-necessity defense and that because it did
not raise this affirmative defense during discovery or
in any responsive pleadings, it was waived. The trial
court also denied this motion. It found that evidence
of the defendant's economic condition was relevant to
disproving a required element of plaintiff's prima
facie discrimination case because the evidence
tended to disprove that he was terminated because of
a handicap.

During closing argument, the attorneys for the
plaintiff and the defendant focused the jurors' atten-
tion on whether the plaintiff, for purposes of meeting

---

[6] In fact, the plaintiff does not dispute that with the benefit of his oper-
ation and the antirejection medication, he is in good health and currently
has no functional limitations.

the HCRA's definition of handicap, should be viewed with or without his antirejection medication. The plaintiff's attorney argued that the law requires that the plaintiff's condition be considered without the benefit of his medication and that, because he would die if he did not take his medicine, his condition met the HCRA's requirement of substantially limiting a major life activity.[7] Conversely, the defense argued that the law required that the plaintiff's condition be viewed as it presently existed, i.e., with the benefit of his medication.

Before closing argument commenced, the plaintiff requested a special jury instruction regarding the effect of mitigating measures, such as medication, on an individual's handicapped status. The proposed instruction was as follows:

> A person that has a determinable physical [characteristic] which substantially limits one or more life activities is handicapped even if the determinable physical condition is controlled with medication or medical care.

The trial court refused to give the instruction, concluding that it was more appropriate to simply instruct the jury in the language of the act, without distinguishing between the plaintiff's premedicated and postmedicated states. During deliberations, the jury sent a note to the trial judge inquiring about the relevance of the plaintiff's dependence on medication.

---

[7] The plaintiff's medical expert, Michael R. Lucey, M.D., testified as follows:

> Q. What would happen to Gary if he ceased taking these medications that you referred to?
> A. If he stops taking his immunosuppressive medicines, he will reject his liver graft, and he will die, unless he's transplanted again.

The court refused to comment further on the issue and instructed the jurors to rely on the evidence presented and on the instructions already given. The jury returned a general verdict for the defendant.[8]

The Court of Appeals affirmed, rejecting the plaintiff's arguments that the trial court erred in failing to give the proposed special jury instruction and in allowing evidence regarding plaintiff's alcoholism and defendant's economic condition. We granted leave to appeal in an unlimited grant order.[9]

II

BACKGROUND

The HCRA prohibits discrimination against individuals because of their handicapped status. The purpose of the act is to mandate "the employment of the handicapped to the fullest extent reasonably possible." *Allen v Southeastern Michigan Transportation Authority*, 132 Mich App 533, 537-538; 349 NW2d 204 (1984). The act is remedial, and, as a remedial act, it is to be liberally construed by the courts. See *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 398; 572 NW2d 210 (1998); *Allen, supra*. Further, in interpreting provisions of the HCRA, analogous federal precedents are persuasive, although not necessarily

---

[8] Because the parties could not agree on a special verdict form, the court used a general form. Consequently, it is impossible to determine whether the jury presumed that it should consider plaintiff's medicated state and determined that he was not handicapped, or if it found the plaintiff to be handicapped, but granted no relief for some other reason. For example, it might have believed the defense position that the defendant actually did terminate the plaintiff because he did not meet the sales quotas and because it was experiencing an economic downturn and could not justify continuing plaintiff's sales position.

[9] 456 Mich 869 (1997).

binding. *Robson v General Motors Corp*, 137 Mich
App 650; 357 NW2d 919 (1984), rev'd on other
grounds 427 Mich 505; 398 NW2d 368 (1986). Federal
courts have similarly noted that analysis of claims
under the HCRA largely parallels analysis under the
federal Americans with Disabilities Act. *Hamlin v
Flint Charter Twp*, 942 F Supp 1129, 1136 (ED Mich,
1996); *Fritz v Mascotech Automotive Systems Group,
Inc*, 914 F Supp 1481 (ED Mich, 1996).

To prove a discrimination claim under the HCRA, the
plaintiff must show (1) that he is handicapped as
defined in the act, (2) that the handicap is unrelated
to his ability to perform his job duties, and (3) that he
has been discriminated against in one of the ways
delineated in the statute. *Ashworth v Jefferson Screw
Products, Inc*, 176 Mich App 737, 743; 440 NW2d 101
(1989). This case primarily involves the first element,
i.e., whether the plaintiff is handicapped as defined in
the act.

The act, as amended in 1990, defines handicap as
follows:

> (i) A determinable physical or mental characteristic of an
> individual, which may result from disease, injury, congenital
> condition of birth, or functional disorder, if the
> characteristic:
>
> (A) For purposes of article 2 [employment discrimina-
> tion], substantially limits 1 or more of the major life activi-
> ties of that individual and is unrelated to the individual's
> ability to perform the duties of a particular job or position
> or substantially limits 1 or more of the major life activities
> of that individual and is unrelated to the individual's qualifi-
> cations for employment or promotion.

\*          \*          \*

(ii) A history of a determinable physical or mental characteristic described in subparagraph (i).

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i). [MCL 37.1103(e); MSA 3.550(103)(e).][10]

For purposes of employment discrimination under article 2 of the act, the definition of handicap does not include:

A determinable physical or mental characteristic caused by the use of an alcoholic liquor by that individual, if that physical or mental characteristic prevents that individual from performing the duties of his or her job. [MCL 37.1103(f)(ii); MSA 3.550(103)(f)(ii).]

The act does not specifically address mitigating measures, such as medication. Consequently, we must engage in a more detailed analysis of how such measures affect a person's handicapped status. We turn next to this issue and will consider the plaintiff's other claims of error regarding admission of evidence of the plaintiff's alcoholism and of the defendant's economic conditions later in this opinion.

III

CLAIMED INSTRUCTIONAL ERROR

The question whether to consider a person's unmitigated condition in determining handicapped status under the 1990 HCRA definition of "handicap" is one of first impression. Because the HCRA definition mirrors

---

[10] We note that the plaintiff does not rely on subsections (ii) or (iii) to prove his HCRA claim. Consequently, this opinion does not deal with the interpretation of these provisions.

that of the ADA, we examine federal law for guidance.[11]

While the ADA itself, like the HCRA, does not specifically address the issue of mitigating measures, the Equal Employment Opportunity Commission, the federal agency charged with administering the act in the employment context, has determined that an individual's status should be determined not as it presently exists, but as it would exist without regard to medication or other mitigating measures. The interpretive guidelines state:

> The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices. See Senate Report at 23, House Labor Report at 52, House Judiciary Report at 28. For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine. Similarly, an individual with a hearing loss would be considered to have an impairment even if the condition were correctable through the use of a hearing aid. [29 CFR 1630.2(h), Appendix, p 350 (1997).][12]

Despite this interpretive guidance, and the general rule that federal courts accord deference to agency

---

[11] In pertinent part, the ADA defines "disability," the term used in that act in place of the HCRA's term "handicap," as follows:

a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual . . . . [42 USC 12102(2)(A).]

[12] See also 29 CFR 1630.2(j), Appendix, p 351 (1997), which states that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices."

interpretation of the act that the agency is charged to administer,[13] many federal courts that have considered the issue have rejected the EEOC's guidelines. Federal courts are split on whether the ADA requires consideration of the individual's present status, or whether the EEOC guidelines should be followed and consideration be given to the individual's condition as it would hypothetically exist without the aid of mitigating measures.[14]

We find the reasoning of those federal courts that have rejected the EEOC guidelines to be persuasive and that this reasoning applies to our interpretation of the HCRA. We will turn next to a review of the arguments presented by these courts.

First, and most important, the approach taken in the EEOC guidelines contravenes the plain language of the ADA, and also of the HCRA. The ADA and HCRA definitions require an individual *to have* a condition that substantially limits a major life activity. In contrast, the administrative gloss imposed on this plain language by the guidelines provides that an individual who *would have* a substantial limitation *if* he failed to take his medication or discontinued using other miti-

---

[13] See, e.g., *Chevron USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837; 104 S Ct 2778; 81 L Ed 2d 694 (1984).

[14] See, e.g., *Coghlan v HJ Heinz Co*, 851 F Supp 808 (ND Tex, 1994), and *Harris v H & W Contracting Co*, 102 F3d 516 (CA 11, 1996). The dissent's suggestion that the overwhelming majority of federal courts have adopted the EEOC approach is misleading. Rather, federal district courts appear to be fairly evenly divided on the issue. Further, while there does appear to be a majority of federal courts of appeals that have followed the EEOC, there also appears to be a recent trend toward disregarding the EEOC guidelines. See, e.g., *Gilday v Mecosta Co*, 124 F3d 760 (CA 6, 1997). We also note that the EEOC guidance carries far less persuasive force for this Court in interpreting a Michigan statute than it does for federal courts in interpreting the ADA.

gating measures comes within the definition.[15] In other words, the EEOC approach, which is the approach that the plaintiff would have this Court adopt, would require us to read out of the statute the requirement that the individual's condition substantially limits a major life activity. As this Court has stated on numerous occasions, where a statute is clear and unambiguous on its face, we will follow the clear language as written without engaging in judicial construction. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135-136; 545 NW2d 642 (1996).

Many federal courts have also taken this view. As explained by the court in *Coghlan v HJ Heinz Co*, 851 F Supp 808, 813 (ND Tex, 1994), a case involving an individual with controlled diabetes mellitus:

> Defendant's argument appears to run like this: In order to have a disability under the ADA, one must have a physical or mental impairment that substantially limits one or more major life activity [sic]. Yet the EEOC's interpretative guidance states that a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication. This gloss reads "limits" right out of the statute because an insulin-dependent diabetic who takes insulin could perform major life activities and would therefore not be limited. Because the EEOC gloss requires determination of "disability" regardless of an insulin-dependent diabetic's limitation, it is at odds with the statute. In other words, the EEOC interpretation requires that one not having a limitation

---

[15] As noted by the court in *Sutton v United Air Lines, Inc*, 130 F3d 893, 902 (CA 10, 1997), "we are concerned with whether the impairment affects the individual in fact, not whether it would hypothetically affect the individual without the use of corrective measures." The court in *Sutton* held that mitigating measures, in that case eyeglasses, must be taken into consideration in determining whether an individual's impairment substantially limits a major life activity.

be considered as having a disability even though the statutory language clearly requires substantial limitation. [*Coghlan* at 813.]

This rationale is equally applicable to plaintiff's handicap claim. We must examine the plaintiff's condition as it exists, with the benefit of his antirejection medication. Because he has no limitations of any major life activities, he does not have a handicap.

A recent decision from the United States Court of Appeals for the Sixth Circuit is also instructive. In that case, *Gilday v Mecosta Co*, 124 F3d 760 (CA 6, 1997), involving a noninsulin dependent diabetic, a majority of the court, consisting of Judges Kennedy and Guy,[16] determined that the ADA required assessing the individual's condition as it presently existed with his oral medications and his diet and exercise regimen.[17] As Judge Kennedy explained:

In my opinion, the EEOC's rule on mitigating circumstances conflicts with the text of the ADA and is, therefore, not a "permissible construction of the statute." *Id.* To be "disabled" under 42 USC 12102(2)(A), an individual must prove (1) that he has an impairment, and (2) that this

---

[16] It should be noted that although Judge Moore's opinion appears as the lead opinion, Judge Kennedy's opinion is controlling regarding the definitional question at issue here.

[17] Judge Moore accepted the EEOC guideline approach. In her view, the EEOC's interpretation is consistent with the text of the statute because "[a] person with a serious disability who depends on medicine or a medical device to ameliorate the effects of that disability nonetheless has a limit on a major life activity: without the corrective measure the person would be unable to perform a major life activity." *Gilday, supra* at 763. Judge Moore also reasoned that the EEOC approach is consistent with the purpose of the statute. She also found support for the agency's interpretation in the legislative history of the act. Other courts that have embraced this view have utilized similar reasoning. See, e.g., *Harris v H & W Contracting Co*, n 14 *supra*; *Roth v Lutheran General Hosp*, 57 F3d 1446 (CA 7, 1995); *Sicard v Sioux City*, 950 F Supp 1420 (ND Iowa, 1996).

impairment substantially limits a major life activity. The EEOC's rule is at odds with this second requirement. Under the EEOC's Interpretive Guidance, an individual is considered disabled even if, with the benefit of medication, the individual is not, in fact, substantially limited in any major life activity. The EEOC's rule, in effect, eliminates the statutory requirement that an impairment "substantially limit[]" a major life activity in order to constitute a disability. As a result, I believe that the ADA's definition of disability "cannot bear the interpretation adopted by" the EEOC in 29 CFR 1630 App 1630.2(j), *Sullivan v Everhart*, 494 US 83, 92; 110 S Ct 960, 966; 108 L Ed 2d 72 (1990), and therefore, that this Court should not give effect to the EEOC's interpretive rule. See *Public Employees Retirement Sys v Betts*, 492 US 158, 171; 109 S Ct 2854, 2863; 106 L Ed 2d 134 (1989) ("[O]f course, no deference is due to agency interpretations at odds with the plain language of the statute itself"). [*Id.* at 766-767.]

Countering the argument presented by Judge Moore that the EEOC approach is consistent with the legislative history of the act, Judge Kennedy reasoned that "[w]here the statutory text is unambiguous . . . as I believe it is here, that ends the matter. '[W]e do not resort to legislative history to cloud a statutory text that is clear.' *Ratzlaf v United States*, 510 US 135, 147-148; 114 S Ct 655, 662; 126 L Ed 2d 615 (1994)." *Gilday* at 767. Michigan law in this regard is in accord. *Luttrell v Dep't of Corrections*, 421 Mich 93, 101; 365 NW2d 74 (1984); *Tryc, supra.* Consequently, we reject the plaintiff's argument that the legislative history of the HCRA supports the view that an individual's handicapped status should be

determined without regard to his actual condition with mitigating measures.[18]

We also find persuasive defendant's argument that the EEOC approach creates a slippery slope that would lead to the inclusion of many commonplace and relatively benign and easily remedied conditions into the act's definition of handicap. For example, an individual with myopia or hypertension that, when treated, is not substantially limiting would be deemed to be handicapped when viewed in his untreated state. This Court declines to head down that slippery slope.[19] We note that federal courts interpreting similar language in the Rehabilitation Act, the precursor of the ADA, have noted that the high purpose of the act of assuring that truly disabled yet capable individuals are protected from discrimination would be debased if the statute's protections could be invoked by relatively minor and commonplace impairments. See, e.g., *Forrisi v Bowen*, 794 F2d 931, 933 (CA 4, 1986). To protect against this, the ADA and the HCRA include the requirement that an individual have a condition that substantially limits a major life activity. These words

[18] In this regard, the plaintiff presents a statement by former Representative H. Lynn Jondahl, a cosponsor of the 1990 amendments of the HCRA, to the effect that persons with controlled diabetes or epilepsy are protected by the act. Besides the irrelevance of such statements where the act is unambiguous, we note that the opinion of a single legislator is not necessarily equivalent to the intent of the entire Legislature at the time of enactment. Consequently, the dissent's reliance on this "legislative history" is specious.

[19] The dissent fails to truly understand this argument. It states, *post* at 631, n 14, that the slippery slope argument does not apply because courts must continue to undertake a case-by-case analysis. Even if under the EEOC approach courts were to examine each case individually, by failing to consider the individual's actual state as it presently exists with mitigating measures, more and more individuals with easily remedied conditions, whom we believe the Legislature did not intend to sweep into the act's protection, would be deemed handicapped.

have real meaning. They set the standard for deter-
mining which conditions will meet the definition and
which will not. By limiting the HCRA's protection to
individuals having conditions that actually impose
substantial limitations, the standard preserves the
high purpose of the act.[20]

To these points we add a word of caution. In some
instances, an individual's condition will be substan-
tially limiting despite the use of medications, pros-
thetic devices, or other mitigating measures. Courts
must analyze the individual's condition case by case.
For example, while probably most eyeglass wearers
will not have a substantially limiting condition,[21] there
should be no categorical conclusion that all eyeglass
wearers fail to meet the HCRA definition. A visual
problem that renders the person virtually blind in the
morning before he dons his glasses and requires
coke-bottle thick lenses to correct his visual acuity
might meet the definition. Similarly, a person with an
amputated leg who functions quite well with a pros-
thetic limb might nevertheless meet the definition if
he can show that his ambulation is significantly
slowed or limited in another way, or if he can show
that the use of the limb in itself is time-consuming or
substantially burdensome to the performance of his
major life activities. An appropriate analogy is a stat-

---

[20] The dissent claims that we neglect to consider the purpose behind
the act and instead rely on a "strained plain-language argument." *Post* at
624. To the contrary, as we have noted, our analysis is consistent with the
purpose of the act, which is to afford protection to the truly disabled. Fur-
ther, we fail to understand how upholding the definition's clear language
can be deemed a "strained" argument. The act clearly requires that the
characteristic substantially *limits* a major life activity. Surely, one could
not seriously characterize as "strained" an analysis that honors the Legis-
lature's choice of the present tense.

[21] See, e.g., *Sutton, supra.*

ute that burdens an individual's right, but does not completely impede his ability to exercise that right. If the burdens associated with use of the mitigating device are great enough, the definition will be met.[22]

We note that other jurists have noted the importance of a case-by-case analysis. Judges Kennedy and Guy, in both their separate opinions in *Gilday* emphasized this point. Judge Kennedy stated:

> Of course, it may well be in some instances that the controlling medication (or other mitigating measure) will itself impose a substantial limitation on an individual's major life activities. In such cases, the individual will be "disabled" [or handicapped] under the ADA [or the HCRA]. [*Id.* at 767.]

Similarly, Judge Guy stated:

> In my view, the impact of mitigating measures must be decided on a case-by-case basis. In some cases a person with a "controlled" medical problem or condition will be completely functional and should be evaluated as such. In other cases a person with a controlled medical condition may still be under a disability as defined by the Act. Indeed, what is necessary to "control" the condition may be part of what makes the person disabled. [*Id.* at 768.]

Likewise, we caution that courts must carefully analyze each individual claiming a handicap and must not categorically apply the definition to a given diagnosis.[23]

---

[22] Judge Moore, in her lead opinion in *Gilday*, used this analogy, but to reach the wrong conclusion. She stated that "[t]o put a condition on the activity of, for example, hearing, limits that ability, in the same way that putting a condition on the exercise of a right impairs that right." *Id.* at 763. What Judge Moore overlooked is that not every condition placed on the exercise of a right is tantamount to an impairment of it.

[23] The dissent makes much of three Michigan Court of Appeals cases, *Hines v Grand Trunk W R Co*, 151 Mich App 585; 391 NW2d 750 (1985),

*Crittenden v Chrysler Corp*, 178 Mich App 324; 443 NW2d 412 (1989), and *Szymczak v American Seating Co*, 204 Mich App 255; 514 NW2d 251 (1994), which it reads as supporting its view that this Court should disregard the individual's condition as it exists with mitigating measures. Even if those Michigan Court of Appeals cases were binding on this Court, which of course they are not, they are distinguishable and actually support assessing the individual in his present medicated state.

*Hines* is simply not applicable, because it interprets the pre-1990 definition of handicap, and actually stands for the proposition that one should consider an individual's mitigated state. *Hines* required analysis of whether an insulin-dependent diabetic met the pre-1990 definition of handicap. That definition did not require a substantial limitation of a major life activity. It did, however, require that the individual have a condition resulting from disease, or a history of such a condition, that is unrelated to the individual's ability to perform the duties of the job. The defendant apparently argued that Mr. Hines, as a matter of law, could not meet the definition because his diabetes affected his ability to perform his job functions. The Court determined that, because with his insulin the plaintiff's diabetes might not affect his job, it was improper to determine that he was not handicapped as a matter of law.

*Crittenden* similarly involved whether the plaintiff's condition, hypertension, rendered him unable to perform the available work. The Court held that whether plaintiff's condition rendered him unable to perform the work was a factual question that should be determined by the jury. As in *Hines*, *Crittenden* analyzed the pre-1990 definition of handicap and actually supports looking at the person in his medicated state. Particularly, the Court dispensed with the defendant's argument that plaintiff was not handicapped because his hypertension would affect his work by noting that the plaintiff had presented evidence that his hypertension, when controlled by medication, would not affect his working ability. *Id.* at 332.

In *Szymczak*, the Court of Appeals determined that there was a disputed factual question whether the plaintiff's seizure disorder rendered him unable to safely perform his job. Even when medicated, the plaintiff had a history of seizures that came on without warning. The Court determined that if the job required the use of power tools, the danger presented from the unpredictable seizures would render him unable to perform the job, even with his medication.

A close review of the facts and analyses of these cases, rather than supporting the dissent's view, actually supports the view that the individual should be assessed in his present medicated condition. Further, the dissent's claim that under our analysis the plaintiffs in *Hines* and *Szymczak* would not meet the definition is incorrect. Mr. Hines' diabetes was apparently not fully controlled with insulin, defendant's physician had found that his blood sugar was unacceptably high. We simply do not know whether his condition, with medication, would limit a major life activity. Similarly, Mr. Szymczak's seizure disorder was not fully controlled with medication. Conceivably, his uncontrollable and unpredictable seizures

Having concluded that the law requires the factfinder to assess the individual's condition as it actually exists, we hold that the trial court did not err in refusing to give the requested instruction. We therefore affirm the Court of Appeals affirmance of the jury verdict for the defendant. We do not, however, endorse the analysis of the Court of Appeals on this issue. That Court concluded that the requested instruction required a finding that a medicated individual is handicapped per se. We cannot agree. When viewed in context of the entire body of instructions given the jury, we do not agree that the requested instruction was misleading in this way.[24] We simply note that it was an erroneous interpretation of the law. We also note that, by allowing plaintiff and defense counsel to both present their conflicting views of the law, the jury was improperly placed in the position of choosing which version was the correct statement of the law. This said, however, because the jury's verdict was not inconsistent with substantial justice, any error in failing to properly instruct the jury regarding the law does not require reversal. *Johnson v Corbet*, 423 Mich 304, 326; 377 NW2d 713 (1985).

---

might be disruptive enough to constitute a substantial limitation of a major life activity under the current definition.

[24] The Court of Appeals mischaracterized the requested instruction as defining a handicap. A careful review, however, shows that the instruction merely attempted to clarify, albeit mistakenly in our view, that a condition that would be substantially limiting if not for the mitigating measures meets the definition. The jury was also instructed regarding the definition of "handicap" from the verbatim language of the HCRA. Likewise, we do not deem determinative the absence of the word "major" before the words "life activities" in the proposed instruction. The phrase "major life activities" was included in the instruction regarding the HCRA definition of "handicap."

IV

## CLAIMED EVIDENTIARY ERRORS

We next turn to the plaintiff's claims that the Court
of Appeals erred in upholding the trial court's admis-
sion of evidence of his alcoholism and evidence of
the defendant's economic condition at the trial. A trial
court's decision to admit evidence is within its sound
discretion and will not be disturbed absent an abuse
of discretion. *People v Bahoda*, 448 Mich 261, 289; 531
NW2d 659 (1995). With this standard in mind, we turn
to the first claimed evidentiary error.

A

### EVIDENCE OF ALCOHOLISM

As noted earlier in this opinion, for purposes of
employment discrimination, the HCRA expressly
excludes from the definition of "handicap" determina-
ble physical or mental characteristics caused by the
use of alcohol when the alcohol-related condition pre-
vents the employee from performing his job duties.
MCL 37.1103(f)(ii); MSA 3.550(103)(f)(ii). The plaintiff
argues that even the defendant conceded that his
alcoholism did not affect his job performance. Conse-
quently, he argues that evidence of his alcoholism
was not relevant to whether he was handicapped.
Further, the plaintiff argues that evidence concerning
his use of alcohol was not relevant to the issue of
damages because it related only to life expectancy,
which was not at issue in the case, and not to his pro-
jected retirement age. The plaintiff further argues
that, even if his alcoholism were relevant, it should
not have been admitted because the danger of unfair

prejudice from this evidence substantially outweighed any probative value. MRE 403.

We agree with the Court of Appeals that evidence of the plaintiff's use of alcohol was relevant in determining the plaintiff's handicapped status and that its probative value in this regard was not substantially outweighed by unfair prejudice. While at the close of proofs it became fairly apparent that the plaintiff's use of alcohol did not affect his job performance, this was not a foregone conclusion. For example, there was evidence that on at least two occasions his alcohol use might have affected his job performance.[25] Further, the defendant presented testimony that the plaintiff was fired because he did not meet his sales quotas. The defendant's theory was that the plaintiff's poor work performance, in the form of failing to meet the quotas, resulted from his failure to fully recover from the injuries caused by his alcoholism. While the plaintiff denied any continuing health problems that affected his job performance, this does not mean that the evidence regarding alcoholism was not relevant. The trial court did not abuse its discretion by allowing the jury to hear the evidence on both sides of this issue.

Further, the trial court carefully cautioned the jury regarding how the evidence of alcoholism should be used. The court instructed that plaintiff could not be found to have a handicap if the condition caused by his use of alcohol affected his job duties, but that he could be found to have a handicap if the condition caused by his use of alcohol did not prevent him from performing his job duties. This instruction helped

---

[25] See n 2.

diminish the potential prejudicial effect of the evidence.[26]

Additionally, we agree with the Court of Appeals that the evidence was relevant to the issue of damages. Expert testimony was elicited to the effect that the plaintiff, as a person with a liver transplant, could expect a lower life expectancy. From this evidence, a reasonable jury could infer that the plaintiff's ability to continue in his employment might be affected, reducing the amount of damages flowing from the alleged employment discrimination. Further, the plaintiff sought damages for mental anguish and other noneconomic damages. The amount of these damages would have been directly related to life expectancy. Consequently, we conclude that the Court of Appeals did not clearly err in concluding that the trial court did not abuse its discretion in allowing evidence of the plaintiff's alcoholism.

---

[26] The trial court's instructions in this regard were as follows:

Now, ladies and gentlemen, if the history of the physical characteristic was caused by the use of alcoholic liquor but the physical characteristic did not prevent the Plaintiff from performing his job, then you are to disregard the fact that use of alcohol caused the physical characteristic.

On the other hand, if you find that the Plaintiff has a determinable physical characteristic caused by the use of alcoholic liquor and that characteristic prevented the Plaintiff from performing the duties of his job, then the Plaintiff is not handicapped under the law.

A person, ladies and gentlemen, cannot have a history of determinable physical characteristic to be construed as a handicap if the physical characteristic was caused by the use of alcoholic liquor which prevented the person from performing the duties of his job.

B

EVIDENCE OF DEFENDANT'S ECONOMIC CONDITION

The plaintiff also contends that the Court of Appeals erred in upholding the trial court's admission of evidence of the defendant's financial condition. The plaintiff argues that because the defendant did not raise economic necessity as an affirmative defense in its responsive pleadings or in discovery, all evidence concerning the defendant's financial condition should have been excluded at trial. We agree with the Court of Appeals analysis of this issue. That Court stated:

> An affirmative defense is a defense that does not controvert the establishment of a prima facie case, but that otherwise denies relief to the plaintiff. [*Stanke v State Farm Mut Automobile Ins Co*, 200 Mich App 307, 312; 503 NW2d 758 (1993).]

> In a handicap discrimination case, the plaintiff has the burden of proving as an element of the prima facie case that the employer discharged the plaintiff because of the handicap. *Dzierbowicz v American Seating Co*, 209 Mich App 130, 132; 530 NW2d 158 (1995), rev'd on other grounds 450 Mich 969 (1996). Evidence that the decision to terminate the plaintiff was motivated by economic considerations directly controverted this element of the prima facie case and, therefore, by definition did not constitute an affirmative defense. *Stanke, supra.* Accordingly, the trial court did not abuse its discretion in admitting evidence of defendant's financial condition. [216 Mich App 707, 712-713; 550 NW2d 797 (1996).]

We agree and affirm the Court of Appeals conclusion that the trial court did not abuse its discretion in allowing evidence of the defendant's economic hardship at trial.

V

CONCLUSION

Because the plain language of the HCRA requires
that an individual actually have a determinable char-
acteristic that substantially limits a major life activity,
we hold that the trial court did not err in refusing to
give the plaintiff's requested special jury instruction.
This instruction would have erroneously allowed the
jury to find a handicap even if it concluded that, with
the plaintiff's antirejection medication, he presently
suffered no substantially limiting condition.

We further hold that the trial court did not err in
allowing evidence of the plaintiff's alcoholism and of
the defendant's financial status. The evidence of alco-
holism was relevant to whether the plaintiff's condi-
tion met the HCRA's definition of handicap and to the
issue of damages. Further, the trial court cautioned
the jury regarding the appropriate use of the evi-
dence. We find that the probative value of the evi-
dence was not substantially outweighed by its preju-
dicial effect. The evidence of the defendant's financial
condition tended to disprove that the plaintiff was
fired because of his alleged handicap, an element of
the plaintiff's prima facie case. Consequently, the trial
court correctly rejected the plaintiff's argument that
by failing to plead economic necessity as an affirma-
tive defense, the defendant had waived any argument
relating to its economic condition.

For these reasons, we affirm the Court of Appeals
affirmance of the jury verdict for the defendant.

BRICKLEY, BOYLE, WEAVER, and TAYLOR, JJ., concurred
with MALLETT, C.J.

KELLY, J. (*dissenting*). In this case, the trial court refused to give the jurors plaintiff's requested instruction on the issue of mitigating measures when determining handicapped status. The primary question is whether the Court of Appeals erred in upholding that decision. It is a question of first impression for our Court.

I disagree with the majority's holding that the jury's verdict was not "inconsistent with substantial justice." *Johnson v Corbet*, 423 Mich 304, 327; 377 NW2d 713 (1985). Therefore, I would reverse the decision of the Court of Appeals, vacate the jury's verdict, and remand the case to the trial court for further proceedings.

A trial court's failure to give a jury instruction when requested is reviewed under the "harmless error" standard. MCR 2.613(A); *id.* at 326. The issue of mitigating measures is generally a question of fact for the jury. However, if the jury is to perform its function properly, it must receive correct instructions regarding the law on the effect of mitigating measures.

Generally, the decision that an instruction is accurate and applicable to a case is within the sound discretion of the trial court. *Williams v Coleman*, 194 Mich App 606, 623; 488 NW2d 464 (1992). A trial court has the discretion to give an instruction not included in the Standard Jury Instructions. However, its discretion is limited by the duty to assure that the instructions given accurately state the law. MCR 2.516(D)(4); *Wengel v Herfert*, 189 Mich App 427, 431; 473 NW2d 741 (1991).

The issue here is whether the trial court fulfilled its duty to assure that an accurate instruction was given. Because this is a case of first impression for this

Court and because the Michigan Handicappers' Civil Rights Act (HCRA)[1] definition of handicap reflects that of the Americans with Disabilities Act (ADA),[2] I find the guidance from the federal courts highly persuasive.[3] The guidance is that, when assessing an individual's handicap status, one considers his condition as it would exist without regard to medication or other mitigating measures.

Therefore, I would find that the failure to give the requested instruction regarding mitigating measures was not harmless error.

I

Before its amendment in 1990, the HCRA defined the term "handicap" as follows:

> [A] determinable physical or mental characteristic of an individual or a history of the characteristic which may result from disease, injury, congenital condition of birth, or functional disorder which characteristic . . . is unrelated to the individual's ability to perform the duties of a particular job or position, or is unrelated to the individual's qualifications for employment or promotion. [MCL 37.1103(b)(i); MSA 3.550(103)(b)(i).]

The Legislature amended the definitional language in 1990 to define "handicap." It states in pertinent part:

---

[1] MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*

[2] 42 USC 12101 *et seq.*

[3] The majority acknowledges that "[b]ecause the HCRA definition mirrors that of the ADA, we examine federal law for guidance." *Ante* at 603-604. Most federal courts of appeals follow the direction given by the EEOC. The majority predicts that the future trend is in the opposite direction. However, the fact remains that the majority of federal appellate courts continue to adhere to the position taken by the EEOC.

> A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position . . . . [MCL 37.1103(e)(i)(A); MSA 3.550(103)(e)(i)(A).]

Under both definitions, a condition related to an individual's ability to perform the duties of a job is not a handicap. *Koester v Novi*, 213 Mich App 653, 661-662; 540 NW2d 765 (1995). Mr. Chmielewski's physician testified that, as long as plaintiff took his antirejection medication, his liver transplant would not limit his major life activities or ability to perform job duties.

It should be noted that the definition of "handicapped" contains three interrelated categories of persons who fall within the protections of the act: (1) persons with an underlying disability, (2) persons with a history of an underlying disability, and (3) persons perceived as having an underlying disability. Here, defendant argues that the act does not cover plaintiff because he has no determinable physical characteristic that substantially limits a major life activity when he takes his antirejection medication. The argument focuses on subsection i of the act.

To mitigate that argument, plaintiff relied on testimony from his physician, together with the Court of Appeals holding in *Hines v Grand Trunk W R Co*.[4] He requested the following supplemental jury instruction:

---

[4] 151 Mich App 585, 595-596; 391 NW2d 750 (1985). In *Hines,* the Court of Appeals held that a person who has diabetes that is controlled by the use of insulin is handicapped for purposes of the HCRA. The *Hines* Court specifically rejected a literal reading of the act, although it referred to the

> A person that has a determinable physical [characteristic] which substantially limits one or more life activities is handicapped even if the determinable physical condition is controlled with medication or medical care.

The trial court refused to give the instruction on the ground that *Hines* was decided under the 1990 preamendment definition of handicap. That definition required only that the condition be unrelated to a person's ability to perform the duties of a particular job.

The majority concludes that the requested instruction was properly refused because it does not reflect the proper interpretation of the first paragraph of the definition of handicapped. However, it does not address whether the requested instruction reflects the entire definition of handicapped.[5]

Even if the majority's interpretation of the underlying disability provision of subsection i were correct, the requested instruction would still be proper, because it reflects the language contained in subsection iii. A person who has an underlying disability

---

pre-1990 definition of handicap. Rather, it found that the plaintiff was a protected individual under the act.

See also *Crittenden v Chrysler Corp*, 178 Mich App 324, 332; 443 NW2d 412 (1989), which held that the plaintiff's hypertension was a handicap, even though it was controlled with medication. The majority here states that, because the *Crittenden* Court said "[p]laintiff presented evidence, through his deposition testimony and the affidavit of his personal physician, that his hypertension was being controlled by medication," its decision was predicated upon the inclusion of medication. I find that the quoted statement says nothing about how the Court arrived at its decision. It simply says that the plaintiff presented sufficient evidence to survive summary disposition.

[5] Subsection iii states in pertinent part:

> Being regarded as having a determinable physical or mental characteristic described in subparagraph i. [MCL 37.1103(e); MSA 3.550(103)(e).]

controlled by medication may be handicapped by vir-
tue of being *perceived* as having the underlying disa-
bility. Hence, although the requested instruction could
have been more artfully stated, it is technically
correct.

Merely because plaintiff in this case is able to con-
trol his condition with medication does not mean that
the condition does not substantially limit a major life
activity. I agree with the rationale in *Hines* and
believe that it is applicable to this case. I also con-
clude that, in addition to the analysis regarding actual
disability, a thorough resolution of this case requires
an analysis of perceived disability.

The Court of Appeals decision in this case conflicts
with its earlier decision in *Szymczak v American
Seating Co*, 204 Mich App 255; 514 NW2d 251 (1994).
There, the plaintiff had seizures that were controlled
by medication. The *Szymczak* Court found the plain-
tiff handicapped. It noted:

> Plaintiff takes medication to control the seizures. The
> medication limits their frequency and severity, but does not
> prevent them from occurring. As a result, plaintiff exper-
> iences seizures about once a year, and can expect to con-
> tinue to experience them for the foreseeable future.[6] [*Id.* at
> 257.]

If today's majority opinion were applied to
*Szymczak* and *Hines*, neither would have been found

---

[6] The majority, in discussing this case, states that the *Szymczak* Court
made its decision by considering the use of mitigating measures, namely,
the use of medication to control seizures. However, I find no support for
that position. Rather, *Szymczak* concluded that there was a dispute of
fact regarding the use of power tools. It remanded, stating that the factual
issue had to be decided before the Court could determine whether the
defendant's conduct violated the HCRA. *Id.* at 258.

to be handicapped. Moreover, under the majority's rationale, a great many people who would appear to satisfy the statutory definition would be denied handicapped status. This is because persons with physical disabilities often control them with medication or other mitigating measures.

I conclude that, by narrowing the class of persons qualified as handicapped, the majority contracts the intent of the Legislature in enacting the HCRA. As the Court of Appeals noted in *Crittenden v Chrysler Corp*,[7] the intent was "to mandate the employment of the handicapped to the fullest extent reasonably possible." *Id.* at 331, citing *Allen v Southeastern Michigan Transportation Authority*, 132 Mich App 533, 537-538; 349 NW2d 204 (1984). The *Crittenden* Court held that "[t]o this end, the act should be liberally construed by the courts." *Id.*, citing *Rancour v Detroit Edison Co*, 150 Mich App 276, 285; 388 NW2d 336 (1986); see also *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 398; 572 NW2d 210 (1998), which held that remedial statutes should be liberally construed. In ruling on *Chmielewski*, the majority has failed to liberally construe the act.

II

The majority neglects to consider the purpose behind the statute and the intent of the Legislature in determining whether the Court should consider mitigating measures when determining a disability. Rather, it relies on a strained plain-language argument.

---

[7] 178 Mich App 324; 443 NW2d 412 (1989).

It asserts that the language of the statute is unambiguous, stating:

> The ADA and HCRA definitions require an individual *to have*
> a condition that substantially limits a major life activity. In
> contrast, the administrative gloss imposed on this plain lan-
> guage by the guidelines provides that an individual who
> *would have* a substantial limitation *if* he failed to take his
> medication or discontinued using other mitigating measures
> comes within the definition. In other words, the EEOC
> approach, which is the approach that the plaintiff would
> have this Court adopt, would require us to read out of the
> statute the requirement that the individual's condition sub-
> stantially limits a major life activity. [*Ante* at 605-606.]

That discussion begs the question. If, on one hand, one does not consider medication, then the plaintiff has a substantial limitation on a major life function. On the other hand, if the medication is considered, then he does not have a substantial limitation. Unlike the majority, I find that the Legislature did not clearly and unambiguously address the issue.

The purpose behind that HCRA is to ensure that all persons be accorded equal opportunities to obtain employment and housing, and to utilize public accommodations, services, and facilities. This purpose is echoed in the ADA as well as in the Rehabilitation Act of 1973.[8] The acts share definitional similarities, as well. All define disability as a condition that "substantially limits" one or more of a person's "major life activities." See *Sanchez v Lagoudakis*, 440 Mich 496, 504, n 25; 486 NW2d 657 (1992). The majority disregards the "substantial limitation" language. Its inter-

---

[8] 29 USC 706(8)(B).

pretation narrows the scope of the act, rather than construing it liberally.

As Justice Cavanagh stated in *Pulver v Dundee Cement Co*,[9] where words and phrases have acquired a unique meaning at common law, they are interpreted as having the same meaning when used in statutes dealing with the same subject. Thus, because of the similarity in their purpose and definitions, the ADA and its EEOC guidelines must receive our careful scrutiny in determining legislative intent.

In examining the House Legislative Analysis, HB 4764, April 4, 1990, and June 27, 1990, the Legislature's intent is evidenced by the following:

> Yet like people with diabetes or epilepsy, whose physical condition can be controlled while under treatment, people who are undergoing treatment by a psychiatrist, psychologist, or therapist, or who are receiving medication to control a mental condition, can function as productive members of society. For too long, mentally ill people have been excluded from the protections of the handicappers' civil rights act. This exclusion was never based on any relevant policy considerations and it is time to extend the act's protections to all of our handicapped citizens.[10]

Hence, I conclude from these statements that the Legislature intended that persons like plaintiff, with conditions controlled by treatment, can enjoy protection under the HCRA.

---

[9] 445 Mich 68, 75; 515 NW2d 728 (1994).

[10] Representative H. Lynn Jondahl, the bill's sponsor, made those statements. I agree with the majority that the opinion of a single legislator is not necessarily equivalent to the intent of the entire Legislature. However, the statement is edifying. Moreover, because the HCRA does not specifically address the issue of mitigating measures, I find it difficult to conclude that the statute is unambiguous. Since it is ambiguous, a legislative analysis is appropriate.

Moreover, in *Wilson v Pennsylvania State Police Dep't*,[11] the court rejected a plain language argument. It held:

> I do not find that the text of the statute unambiguously precludes a plaintiff from being considered disabled where he is substantially limited without mitigating measures but is able to use such measures to overcome the substantial limitations which would otherwise flow from his impairment. See, e.g., *Harris v H & W Contracting Co*, 102 F3d 516, 521 (CA 11, 1996) ("There is nothing inherently illogical about determining the existence of a substantial limitation without regard to mitigating measures . . . and there is nothing in the language of the statute itself that rules out that approach"). Although the term "substantially limits" may be unambiguous in and of itself, it nonetheless does not speak to the issue before me; that is, the statute is silent as to whether a substantial limitation is to be considered with or without regard to mitigating measures.

In the absence of interpretation of the amended definitional language in Michigan, federal case law construing the similar language of the federal act provides guidance. I agree with the *Wilson* court rationale and would subscribe to its application in this case.

It is well settled that federal civil rights law is persuasive in interpreting its counterpart under Michigan law. *Fritz v Mascotech Automotive Systems Group, Inc*, 914 F Supp 1481, 1491 (ED Mich, 1996). *Fritz* held that analysis of claims under the HCRA largely parallels analysis under the ADA. Also, *Hamlin v Flint Charter Twp*,[12] held that claims of handicap discrimination under Michigan law essentially track those

---

[11] 964 F Supp 898, 904 (ED Pa, 1997).

[12] 942 F Supp 1129 (ED Mich, 1996).

under federal law. Therefore, crucial to the analysis of this issue under the HCRA are ADA regulations and cases addressing whether mitigating measures should be considered in determining the existence of a disability.

### III

In 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 42 USC 12101(b)(1). In the employment context, it is understood to mean that employers cannot discriminate against people with disabilities in regard to employment practices or the terms, conditions, and privileges of employment.

In order to be protected by the ADA, it must be shown that an individual (1) has a disability, (2) is qualified, and (3) has suffered an adverse employment decision because of the disability. *MacKay v Toyota Motor Mfg, USA, Inc,* 110 F3d 369, 371 (CA 6, 1997). The *MacKay* analysis is pertinent to this case because the issue is whether plaintiff has a disability as defined by the analogous HCRA.

The ADA, 42 USC 12102(2), defines an individual with a disability as someone who has:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) been regarded as having such an impairment.

There appears to be no dispute that Mr. Chmielewski has a physical impairment. Rather, the issue centers on whether the impairment substantially limits a

major life activity, thus adversely affecting his employability.

The amended language in the HCRA is nearly identical to the language in the Federal Rehabilitation Act of 1973, 29 USC 706(8)(B), the precursor of the ADA. The act defines a handicapped individual as any person who (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment.

The EEOC has provided comprehensive guidance on interpreting the ADA, including how to assess whether an impairment is substantially limiting.[13] At first glance, it is not obvious how a condition completely controlled by medication can substantially limit a major life activity. However, the appendix to the applicable federal regulations provides explicit guidance on this point, and that guidance militates against the majority's position. The commentary to 29 CFR 1630.2(h) indicates in pertinent part:

---

[13] In *Gilday v Mecosta Co*, 124 F3d 760 (CA 6, 1997), Judge Kennedy pointed out in her opinion:

"[S]uch administrative interpretations of the [ADA] by the enforcing agency, 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" [*Id.* at 766, quoting *Grenier v Cyanamid Plastics, Inc*, 70 F3d 667, 672 (CA 1, 1995).]

It appears that the guidelines were subject to public notice and comment procedures similar to those that normally apply to regulations. See Equal Employment Opportunity for Individuals with Disabilities, 56 Fed Reg 8578 (1991). Thus, the guidelines arguably have more force than would an ordinary interpretative rule. In any event, I note that, to the extent the guideline is elaborating on a term used in a regulation, it is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ v Shalala*, 512 US 504, 512; 114 S Ct 2381; 129 L Ed 2d 405 (1994).

The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices. See Senate Report at 23, House Labor Report at 52, House Judiciary Report at 28. For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine. Similarly, an individual with hearing loss would be considered to have an impairment even if the condition were correctable through the use of a hearing aid. [Appendix, p 350 (1997).]

The commentary to CFR 1630.2(j) states:

[A]n impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity. Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking. An individual who uses artificial legs would likewise be substantially limited in the major life activity of walking because the individual is unable to walk without the aid of prosthetic devices. Similarly, a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication.

*     *     *

The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices. [Appendix, pp 350-351 (1997).]

Thus, the availability of reasonable accommodation or auxiliary aids, such as hearing aids, to alleviate the effects of a condition has no bearing on whether the

condition is an impairment. It is the scope or per-
ceived scope of the condition itself, not its origin or
capacity for being corrected, that determines whether
it constitutes an impairment.[14]

The mere use of a mitigating measure does not
automatically indicate the presence of a disability.
Some individuals may use medication, prosthetic
devices, or auxiliary aids to alleviate impairments that
are not substantially limiting. For example, applying
the first part of the definition of disability, an individ-
ual who uses a hearing aid to correct a slight hearing
impairment may not have a disability. The individual's
impairment may only mildly affect his hearing and
may not substantially limit his ability to hear. Indeed,
several federal cases have addressed the issue.[15]

Additionally, several circuits have decided ADA
cases that are directly on point. They hold that the
existence of mitigating measures should not be taken
into account when deciding whether a disability

---

[14] The majority states that it "declines to head down that slippery
slope." *Ante* at 609. However, it is the majority's approach, and not the
EEOC's, that gives rise to the slippery slope argument, leading to the cate-
gorical inclusion of many commonplace and relatively benign conditions.
There are no categories under the ADA. Nor does the EEOC refer to any spe-
cific categories. In fact, the EEOC specifically notes that courts must ana-
lyze the individual's condition case by case.

[15] See *Holihan v Lucky Stores, Inc*, 87 F3d 362, 366 (CA 9, 1996),
where, even without the consideration of mitigating measures, the plain-
tiff failed to show that he was substantially limited from any major life
activity; *Oswalt v Sara Lee Corp*, 74 F3d 91, 92 (CA 5, 1996), which held
that high blood pressure alone does not establish a substantial limitation;
*Roth v Lutheran General Hosp*, 57 F3d 1446, 1454-1455 (CA 7, 1995),
which held that mitigating measures should not be considered in deter-
mining an impairment; *Chandler v City of Dallas*, 2 F3d 1385, 1390-1391
(CA 5, 1993), where the court held that both impaired vision and insulin
dependent diabetes did not rise to the level of substantial impairment.

exists.[16] Also, the interpretation provided by the EEOC has recently been considered by the United States Court of Appeals for the Sixth Circuit in *Gilday, supra.* Judge Moore, in her lead opinion in that case, reaches the conclusion held by the majority of the circuits. Her view is consistent with the ADA and EEOC guidelines.

Judge Moore's conclusion is that numerous people with disabilities take medicine, engage in exercise and other regimens, and use accommodations to mitigate the effects of their disabilities. With the help of mitigating measures, they are able to perform the specific requirements of their job. It would be a painful irony if the courts deprived these people of their status as persons protected from discrimination due to disability because of their successful use of mitigating measures.

Moreover, under the federal statute, the courts have recognized that it is sufficient to justify a finding of handicapped status if an individual has a "record" of impairment. It is not relevant if the impairing condition is in remission or under control. In *School Bd of Nassau Co v Arline,*[17] the United States Supreme Court found that hospitalization for tuberculosis constituted a sufficient record of impairment to establish handicapped status under the federal act. In that case, the disease had remained in remission for approximately twenty years after the hospitalization. The Court stated:

---

[16] *Doane v Omaha,* 115 F3d 624, 627 (CA 8, 1997); *Harris, supra* at 520-521. See also *Wilson, supra* at 904.

[17] 480 US 273, 281; 107 S Ct 1123; 94 L Ed 2d 307 (1987).

> This impairment was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment. Thus, Arline's hospitalization for tuberculosis in 1957 suffices to establish that she has a "record of . . . impairment" . . . and is therefore a handicapped individual.

This is further support for a broad reading of the statute.

As this Court did in *Sanchez v Lagoudakis*,[18] I would read the handicap statute broadly. In *Sanchez*, we stated:

> If the employer acts on a belief that the employee has a handicap, and subsequently discharges or otherwise discriminates against the employee on the basis of that belief, it is inconsequential whether the employee actually has the handicap because, in either hypothesis, the employer has undertaken the kind of discriminatory action that the act prohibits.

Against this backdrop, I would hold that the following factors should be considered to determine whether an individual is substantially limited in a major life activity: (1) the nature of the impairment, (2) its severity, (3) its duration or expected duration, and (4) its long-term effect. *Sarsycki v United Parcel Service*, 862 F Supp 336, 340 (WD Okla, 1994). I would find that the existence of an impairment is to be determined without regard to mitigating measures such as medicines.

I believe that the Court of Appeals mischaracterized the requested jury instruction as defining a handicap. Rather, the instruction simply clarified that con-

---

[18] *Supra* at 502.

trol of a determinable physical condition with medication does not disqualify an otherwise qualified person from handicap status.

IV

In conclusion, I find that the majority's position is at odds with the overwhelming majority of federal cases on the subject and with three Michigan Court of Appeals cases, *Hines*, *Crittenden*, and *Szymczak*, *supra*.[19] It conflicts with the intent of the Legislature in enacting the HCRA, with the position articulated by the EEOC, and with common sense.

We do not have the benefit of a special verdict to determine the basis of the jury's decision for defendant. Therefore, we do not know the jury's rationale. Consequently, I would conclude that the failure of the trial court to give plaintiff's proposed instruction resulted in substantial injustice. *Johnson*, *supra* at 327. I would reverse the decision of the Court of Appeals and remand the case to the trial court for a new trial.

CAVANAGH, J., concurred with KELLY, J.

---

[19] Recognizing that we are not bound by these decisions, I nevertheless find them highly persuasive.